**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF COLORADO**

Case No.:

**PIT BARREL® COOKER CO., LLC**

     Plaintiff,

vs.

**BARREL HOUSE COOKER, LLC;
M.D. MANUFACTURING, INC;** and
**BRIAN K. GRAVES**

     Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

COMES NOW Plaintiff, Pit Barrel® Cooker Co., LLC ("Plaintiff" or "PBC"), by and through his legal counsel, Elkus Sisson & Rosenstein, P.C., and hereby submits its Complaint and Jury Demand, and in support thereof, alleges as follows:

## I.    <u>INTRODUCTION</u>

1.    This case arises from Defendants' willful patent infringement, intentional breach of contract, tortious interference with contract and prospective business advantage, unfair trade practices relating to the misuse and misappropriation of PBC's confidential business information and trade secrets, civil conspiracy and theft, violation of Colorado's Consumer Protection Act, and unjust enrichment – all relating to PBC's Pit Barrel® Cooker which was invented, designed, manufactured, and brought to the marketplace by PBC and its owners, Noah and Amber Glanville.  Defendants unlawfully misappropriated Plaintiff's confidential business information

and trade secrets, including a patent for their own use and benefit in the design, manufacture, and sale of their own product, *i.e.,* the barrel house cooker.

## II.  PARTIES

2.      The Plaintiff is limited liability company first organized under the laws of the State of Colorado on or about July 7, 2011.  PBC's two members are Noah Glanville and Amber Glanville, both residents of the State of Colorado.

3.      PBC operated from its principal place of business located at 56077 E. County Road 6, Strasburg, CO 80136 from the time of its formation until it recently relocated to Kentucky on or about September 16, 2015.  PBC current principal place of business is located at 13011 W Hwy 42, Ste., 206, Prospect, KY 40059.

4.      Defendant Barrel House Cooker, LLC ("BHC") is a California limited liability company organized with the California Secretary of State on August 26, 2015 with a principal place of business located at 34970 McMurtrey Ave., Bakersfield California, 93308.  Upon information and belief, BHC is owned, at least in-part, by co-Defendant Brian Graves, a resident of the State of California, who also represents in emails that he leads and controls BHC as its "president."

5.      BHCs registered agent is Raymond Stewart, 7115 Hatfield Ct., Citrus Height CA, 95610.

6.      Defendant M.D. Manufacturing Inc. ("MD"), is a corporation organized under the laws of the State of California with a principal place of business located at 34970 McMurtrey Ave., Bakersfield, CA 93308.

2

7.      MD is controlled by its Chief Executive Officer, Raymond Stewart, who resides at 7112 Hatfield, Citrus Heights, CA 95610. Mr. Stewart is the registered agent for both MD and co-Defendant BHC.

8.      MD also does business as MD Central Vacuum and buildinvacuum.com, and upon information and belief is the alter ego of Co-Defendant BHC.

9.      Defendant Bryan K. Graves is the President of BHC, the General Manager of Co-Defendant MD, and a resident of the State of California. Mr. Graves has been employed by MD for more than 13-years and also caused BHC to be formed in order to intentionally commit the unlawful acts described herein. Mr. Graves currently serves as both the General Manager of MD, and the President of BHC, from the same location at 34970 McMurtrey Ave., Bakersfield California, 93308.

10.     Upon information and belief, Bryan K. Graves resides Bakersfield, CA.

### III.     JURISDICTION & VENUE

11.     This is an action at law and in equity for patent infringement, arising under the Patent Act, 35 U.S.C. § 1, *et seq*., and the laws of the State of Colorado.

12.     Jurisdiction is conferred on this Court pursuant to The Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b), because this case presents well-pleaded federal questions arising under the Patent Act, 35 U.S.C. §§ 1, *et seq.*

13.     This Court also has jurisdiction to resolve any state law claims brought by the Plaintiff under 28 U.S.C. § 1367 and under Colorado law pursuant to C.R.S. § 13-1-124 because the parties transacted business within the State of Colorado and committed, in-part, the tortious acts described herein within Colorado.

14.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) because a substantial part of the events or omissions, including acts of infringement, giving rise to the claims occurred in Colorado while Plaintiff conducted business operations from its principal place of business in Colorado.    Defendants have intentionally and purposefully marketed and sold their products, including the barrel house cooker, directing their acts of infringement to residents of Colorado over the internet, including barrelhousecooker.com, twitter.com/barrelhouseco, facebook.com/barrelhousecooker, MDfg.com, builtinvacuum.com, centralvacuum.com and by offering the barrel house cooker for sale through on-line retailers such as Amazon.com, Inc.

15.    Venue is also proper in the District of Colorado because MD, Graves, and Meyers agreed to a choice of venue provision in a written contract expressly agreeing that venue is proper exclusively in Denver, Colorado.

## IV.    GENERAL ALLEGATIONS

16.    Plaintiff, PBC, designs, manufactures, and sells the Pit Barrel® Cooker, a simple but innovative design that PBC mass produces and sells world-wide that can be pulled right out of the box producing consistent cooking results by making only a single adjust to airflow based on elevation.

17.    In 2011, Noah and Amber Glanville invested their time & money, borrowed money, and otherwise invested everything they had to start PBC from their home in Strasburg, Colorado.

18.    After forming PBC, the Glanville's invented, developed, and tested approximately 29 different prototypes before perfecting the final design and concept of the Pit Barrel® Cooker.

4

19.     On December 30, 2014, the U.S. Patent and Trademark Office duly, properly and legally issued Patent No.: US  8,919,334 B2, entitled "Portable Barrel Cooker," to inventors Noah E. Glanville and Amber D. Glanville of Denver, CO.  This patent was originally filed on July 14, 2011.  A true and correct copy of the '334 Patent is attached hereto as **Exhibit 1**.

20.     PBC is the lawful owner and assignee of the Patent with the right to exclude all others from making, using, importing, or offering to sell the patented invention.

21.     The Pit Barrel® is depicted below:



22.     From 2012-2013 the Pit Barrel® Cooker Company grew five times in sales from $90,000 to $500,000. In 2014, the company continued to grow experiencing $3,000,000.   In 2015, the company projects gross sales of approximately $4,000,000.  PBC currently projects gross sales of $10,000,000 in 2016.

23.     However, this growth did not occur in a vacuum.  Rather, PBC invested heavily in marketing, creative, customer development, service and satisfaction, a strong web presence, "how to" videos, recipes, sales, manufacturing, finance, margin and cost control, and in its manufacturing and distribution network within the United States consistent with the company's philosophy of bringing a price-competitive and quality product to the marketplace that is made primarily in the United States.

24.     As a part of its manufacturing process, PBC contracted with Myers in 2014 to secure the 30-gallon drums which were, and are, utilized in the manufacturing process of the Pit Barrel®.  Simultaneously, Myers also provided steel drums to MD which that company used in the manufacture of their central vacuum systems.

25.     By the late spring of 2014, the Pit Barrel® was selling so well that PBC had to find assistance, importantly to PBC – within the United States – to assist them in the manufacture of the Pit Barrel®.

26.     Upon learning that Myers had excess capacity, combined with a demonstrated expertise supplying the essential steel drums to PBC, PBC met with Myers in its Oakland, CA facility to investigate whether Myers and PBC should expand their relationship to include Myers' assistance with the manufacturing process, in addition to the supplies it was already providing to PBC for the manufacture of the Pit Barrel®.  Myers entered also into a non-disclosure agreement with PBC substantially the same as the agreement entered into with Defendants on or about June 24, 2014.

27.     In early June, 2014 Dan Roth of Myers Container, LLC ("Myers")  recommended to PBC that MD, along with Myers, would be a good fit to bolster and assist PBC in its

manufacturing process because of MD's excess manufacturing capacity and experience working with steel drums in the manufacture of MD's central vacuum systems, such as the Silent Master depicted below:



28.     Prior to MD's and Graves' introduction to the Pit Barrel® through the introduction made by Dan Roth and Myers, neither MD nor Graves had ever manufactured or sold barbeque or outdoor cooking products.  Rather, until it began designing, producing and selling the barrel house cooker, MD and Graves were vacuum manufacturers.

29.     As a part of a "get to know one another" phase, *i.e.,* due diligence, PBC and MD executed a non-disclosure agreement to protect PBC's confidential business information.

30.     The non-disclosure agreement between PBC and MD was executed by Brian K. Graves, as general manager of MD, effective June 24, 2014.

31.     In addition to protecting PBC's confidential business information relating to the Pit Barrel®, the non-disclosure agreement ("NDA") also expressly states, *inter alia,* that the agreement is governed by the laws of Colorado and that the parties submit to the exclusive jurisdiction of the Courts of Denver, Colorado.

32.     As a part of the due diligence, MD had access and exposure to virtually every trade secret which PBC has from marketing data, marketing projections, overhead, customer information, creative, manufacturing data, margins, sales data, sales and market projections, profit information, etc., and the patent information associated with the Pit Barrel®.

33.      On June 11, 2014, MD and Graves congratulated PBC on its success with the Pit Barrel® and actively solicited PBC's business writing to Noah Glanville about PBC's willingness to "allow MD to produce PBC samples for your review, and consideration of our organization [MD] quoting contract manufacturing and supply chain management services."

34.     MD actively solicited a non-disclosure agreement from PBC along with PBC's "product details," "assumptions," "questions," and "project scope."

35.     Subsequently, MD and PBC representatives, including Graves, had extensive conversations, in-person meetings, and PBC disclosed its confidential business information and patent to Graves, MD, and Myers.

36.     MD also completed a Pit Barrel® sample along with three other slight variations on the Pit Barrel® by June 18, 2014 for PBC's review.

37.     On June 24, 2014 the parties executed an NDA and Noah Glanville transmitted voluminous confidential information about the Pit Barrel®.

38.     On June 25, 2014, Noah Glanville from PBC, Brian Graves, and representatives from Myers then met in-person in Bakersfield, CA at MD's facilities to discuss MD's and Meyers' involvement in the manufacture and supply chain of the Pit Barrel®.

39.     On June 28, 2014, apparently measuring market risk for the product, Graves and MD solicited confidential insurance information on the Pit Barrel® and requested other "pertinent information you are able to provide."

40.     On June 30, 2014, Jim Bise from Myers thanked Noah Glanville for allowing Myers to be a part of his "passion" with the Pit Barrel® and submitted certain proposals so Mr. Glanville knew that "we [Myers] are trying to do our part to make this all work," *i.e.,* the relationship between PBC, Myers, and MD.  Mr. Bise's communication to Mr. Glanville included pricing and costs associated with various drums costs, hole punching, and freight.

41.     On July 1, 2014, PBC, Jim Bise and Dan Roth from Myers, and Graves exchanged confidential business information relating to the manufacture of the Pit Barrel®, its drum, punch costs, freight from Myers' facility in Portland, OR, tooling amortization, tooling costs, mark-up, production by geographic location, timelines for production, monthly minimums by unit number, sliding scales for incremental costs, delivery price margins on a quarterly basis, exclusivity and associated costs as a condition of the move and price structure.

42.     Thereafter, Brian Graves represented to PBC on July 1, 2014 that "MD will work quickly and diligently to make this a success for both."  Graves represented that MD started tooling concepts for the Pit Barrel® grill grate brackets, charcoal basket handle and production horseshoe folding, along with looking into insurance quotes, cost accounting and began putting together a manufacturing and distribution agreement between entities.

43.     Graves requested certain confidential business information from PBC on July 1, 2014, which PBC reasonably believed MD and Graves would protect.  Graves wrote on July 1, 2014 that "the cost accounting continues and as such I need to request a considerable amount of

minutia yet we'll be mutually better off in our understanding of cost and profit at time of

agreement that will start us off on the right foot."

    44.    MD requested on July 1, 2014 from PBC the following confidential business

information:

      i.    confirmation of all the associated components and cost breakdowns for the Pit Barrel®;
    ii.    inventory and packaging information;
   iii.    the cost or price for the seasoning "rubs" which PBC markets and sells with its Pit Barrels®;
   iv.    cost per owner's manual;
    v.    the number of hours and people to kit/pack out 120 units;
   vi.    the number of Pit Barrels® one welder can complete in one (1) hour;
  vii.    the typical monthly electric and gas bill over the past 4-6 months;
 viii.    the amount PBC is spending on wire feed, gas, general welding and shop supply per month;
   ix.    labor costs per hour and payroll information;
    x.    price points; and
   xi.    shipping costs.

    45.    PBC provided the data which Graves and MD requested on July 3, 2014.

    46.    On July 5, 2014, Graves requested from PBC: (i) the total number of PBC unties

sold in calendar year 2013; (ii) projections for 2014; (iii) costs for sandblast equipment & set-up;

and (iv) the number of forklifts PBC was utilizing, along with its ownership structure for this

equipment.

    47.    PBC provided the information that same day to Graves and MDW

    48.    Graves, MD, and PBC also discussed at length various technical options and costs

for coating, such as powder coating, the drums of the Pit Barrel®. Graves, Myers, and PBC also

discussed PBC analysis and consideration of various drum sizes for future Pit Barrels®.

49.     However, Graves and MD attempted to talk PBC out of manufacturing the Pit Barrel® with porcelain coating, instead advocating for powder coating the product.  PBC disclosed to Graves the significant investment and research PBC had put into making a coating decision and that porcelain coating was a better material and produced a better product. However, Graves insisted that porcelain was "too expensive."

50.     Upon information and belief, Graves and MD where by this time planning to "rip off" the Pit Barrel® and bring their own product to market based on the drum it utilized for the Silent Master vacuum system depicted above.  When Defendants went to market with the barrel house cooker, discussed below, it had porcelain coating.

51.     Nevertheless, on July 2, 2014, Graves wrote to PBC that he was working on packaging for the Pit Barrel® and meeting with packing engineers the following week to review box and packing options for the Pit Barrel®.  Graves also indicated that he wanted to discuss branding, PBC's logo, and its website rollout.

52.     MD knew that the information PBC provided to it was confidential trade secrets as evidenced by the confidential NDA it entered into with Nello's Custom Fabrication Shop (Chris Diuri) relating to Nello's welding services on the Pit Barrel®. Even though Graves and MD did not disclose to PBC the existence of MDW's relationship with Nello until July 11, 2014, PBC is a third-party beneficiary of this contract dated June 9, 2014 because it was intended to protect the confidential business information and patent of PBC, information which was provided to MD by PBC.

53.     By July 18, 2014 the parties continued to discuss cost accounting figures, production, actual production usage, labor and full scale production of the Pit Barrel®.  PBC also

shared a quote prepared by Remy Smith from Asian ProSource, LLC of Las Vegas, NV which

PBC obtained for a small coal grate.  PBC shared ProSource's contact information, its point of

contact, together with its quote confidentially with Graves and MD on July 18, 2014.  Graves

responded on July 18th – seemingly pleased with the information – that the quote was "more

than adequate to start with."

54.     Graves and MD also represented to PBC on July 18, 2014 that they "were

working as quickly as possible" on packaging and addressed PBC's current "kitting expenses" in

the revised cost accounting projections.  Graves and MDW then represented to PBC that some of

its numbers were "teaks" once "componentry has been landed and actual production usage (i.e.,

powder) and labor are known after full scale production" of the Pit Barrel®.

55.     By July 18, 2014, MD and Graves mislead PBC by representing in an email from

Graves:   "I  am willing to partner with you and your Team in a long term (five year minimum),

exclusive manufacturing and distribution agreement" proposing confidential terms relating to

MD's and Graves' markup for the production.

56.     Graves also represented to PBC that:  "There remains much work to be

accomplished on all fronts.  Yet I believe we have arrived to a point in the opportunity where

MD has proven its contribution capabilities, the finished good economics now allow for

outsource and so that each company need evaluate if their interest can be served first under the

production price model."

57.     On July 18, 2014, PBC, Graves and MD exchanged a spreadsheet containing

PBC's confidential cost analysis, which is a detailed accounting of components, costs, unit

numbers, and freight.  That same day, PBC, Graves, and MD also exchanged MD's so-called

*value proposition* which Graves provided to PBC to "assist[] you in articulating MD's value

capabilities to the PBC Team."  MD's value proposition misrepresented "history, culture, and

personnel," its "strong organizational management, personal, and professional relationship," its

"financial," "facilities," "systems," "core competencies," etc.

58.     On July 18, 2014, Graves represented and acknowledged to PBC that he had a

responsibility to know PBC's business, that he understood PBC's marketplace, PBC's retail and

dealer price points, along with PBC's model.

59.     Upon information and belief, Graves also intentionally presented options to the

Board of Directors of MD, without PBC, on July 18, 2014 relating to the possible production and

approval of its own cooker, *i.e.,* the barrel house cooker, to compete with the Pit Barrel®.

60.     However, while Graves and MD continued to induce PBC to provide confidential

business information, continue discussions and negotiations about a final manufacturing

agreement, Graves, Myers, and MD were hatching a plan to misappropriate PBC confidential

business information and trade secrets, and then to manufacture, market, and sell to the public in

Colorado and throughout the United States its own "barrel house cooker."

61.     On July 18, 2014, Graves expressed to PBC that he could "knock off" the Pit

Barrel® or challenge PBC's patent, and otherwise work around PBC's claim.  In spite of this,

during the final negotiations process, Graves also assured PBC on July 18, 2014 that he was not

going to take advantage of PBC or exploit PBC monetarily.

62.     On July 22, 2014, Graves and MD participated in fiscal year end budgetary

meeting, without PBC, which very likely included discussions and planning with respect to the

design, manufacture, and sale of the barrel house cooker.

63.     Following this July 22, 2014 meeting, Graves and MD continued to exchange confidential business information on the manufacture and distribution of the Pit Barrel®, including production capacity, labor requirements, amortized capital expenses, the manufacturing process, costs, tiered incentives, transportation, the structure of the proposed agreement between MD and PBC, etc.  At no time did Myers, Graves, or MD disclose to PBC that it intended to sell its own product intentionally and willfully infringing on PBC's patent.

64.     In working with Graves, Myers, and MD, PBC reasonably relied on the NDA and the representations made by Graves, Bise, and others that PBC's confidential business information, trade secrets, and patent would not be misappropriated by defendants for their own personal gain.

65.     When MD and Graves finally submitted their proposal to PBC for a exclusive manufacturing and distribution agreement to PBC for consideration, it contained terms so commercially unreasonable that it is clear that they never intended to actually manufacture and distribute the Pit Barrel®.

66.     Rather, Defendants' intent after receiving PBC's confidential business information and trade secrets, including market projections, gross sales data, margins, profits, etc., was to propose a deal to PBC that was so commercially unreasonable that PBC would not enter into the long term arrangement which Defendants intended to capitalize into an opportunity to bring their own product – the barrel house cooker – to market by misappropriating PBC's property developed over years and at great expense to PBC.

67.     By the end of July, Graves, Myers, and MD knew basically every trade secret, patent information, business information, product projections, cost analysis or accounting,

pricing, margins, profits, vendors utilized in the manufacture and sale of the Pit Barrel®, all of which PBC reasonably provided to Graves, Myers, and MD as a part of their prospective business relationship and in the furtherance of the full scale production of the Pit Barrel®.

68.    On July 23, 2014, Graves and MD transmitted to PBC a draft exclusive manufacturing agreement and confidential spreadsheet containing other confidential business information and trade secrets of PBC's.

69.    However, when PBC expressed some concern about the terms which MD was proposing, on July 24, 2014, Graves abruptly withdrew the offer to PBC to manufacture and distribute the Pit Barrel®.

70.    About this time, unknown to PBC, Graves made representations to third-parties involved in the construction of Pit Barrel® prototypes, and subject to an NDA, that he was going to get rich and retire on this product.  Graves further represented to Chris Diuri on or about July 28, 2014, that Graves was going to build a barrel cooker himself.

71.    By this time, Graves and MD also had discussions with Dan Roth from Myers about producing a barrel cooker on their own.  Dan Roth and Myers represented to PBC on July 24, 2014 that it told MD and Graves that they couldn't make barrel cookers and that Myers would not sell them the drums to even do it.

72.    However, Myers did elect to sell barrels to MD and Graves to construct, market and sell, BHC's barrel house cooker.  In-fact, on December 2, 2015, *i.e.,* a year later and shortly after Defendants introduced their own portable barrel cooker –the barrel house cooker –Dan Roth and Myers recanted in an email to PBC once it became clear that Myers was in-fact selling steel drums to MD, Graves, and BHC to unlawfully infringe on PBC's patent and as an unfair

15

trade practice through the misappropriation of PBC's confidential business information and trade secrets.

73.     Shortly after withdrawing from its proposal to manufacture and distribute the Pit Barrel®, Defendants almost immediately went to work on their own barrel cooker based on PBC's design and confidential business informaiton.  For example, on September 29, 2014 a U.S. federal trademark registration was filed for BARREL HOUSE by BARREL HOUSE COOKER, LLC, BAKERSFIELD, CA 93308. The USPTO has given the BARREL HOUSE trademark serial number of 86409231.

74.     After planning for approximately another year, Defendants caused BHC to be formed with the California Secretary of State on August 26, 2015.  Then, shortly before the busy Thanksgiving holiday a few months later, Defendants began selling their barrel house cooker in early November, 2015.

75.     However, it is clear that the seeds of Defendants' conspiracy to misappropriate PBC's property were planted when Graves and MD began seeing the value of PBC's product in June, 2014 from the information PBC gave to Defendants when PBC reasonably believed that the parties were working in good faith towards a manufacturing and distribution agreement.

76.     Nevertheless, when MD withdrew from negotiations for a long term deal between the parties to manufacture and distribute the Pit Barrel®, PBC was left with the same problem it had in June, 2014 when it came to Myers and Defendants – future demand for the Pit Barrel® in the marketplace which exceeded PBC's capability to meet.

77.     PBC thereafter located a company to assist in the metal work associated with the steel drums, Dan Aronson of PNA Metal on or about July 30, 2014 which PBC hoped to utilize

in Oregon because the company was closer to Myers.  PNA Metal was engaged by PBC to machine holes in sheets of steel which would be shipped to Myers to be rolled into the steel drums utilized in the construction of the Pit Barrel®.  Because of PNA's proximity to Myers, this would decrease transportation costs.  Myers obviously knew this because of their confidential business dealings with PBC.

78.     Thereafter, MD discovered – apparently misappropriated from Myers – that PNA could do this type of work on steel sheets.  Defendants eventually engaged PNA Metal to do the very same work as PBC had, *i.e.,* to punch holes in sheets of steel which would then be shipped to Myers to be rolled into the steel drums utilized in the manufacture of Defendants' own barrel house cooker.

79.     The barrel house cooker, along with Defendants' associated website, facebook page, and marketing materials, etc., are nearly identical in style, musical content, artistic content, presentation, etc., to PBC's Defendants have misappropriated PBC's confidential information and trade secrets which they obtained directly from PBC in order to pass it off as their own by re-manufacturing their 16-gallon drum, obtained from Myers and utilized by MD for vacuum cleaners, into a portable barrel cooker, such as PBC's described in **Exhibit** 1.

80.     The barrel house cooker is depicted as follows:



81.    The barrel house cooker infringes on the Pit Barrel® for the following reasons:

i.    an upright metal drum of cylindrical and uniform diameter (even though it can be taken apart, it is capable of forming the above;

ii.    Having a lower closed end-present in the barrel house design;

iii.    A cylindrical basket removably positioned above the lower closed end and containing a heating material;

iv.    a vent in a lower portion of the drum;

v.    at least one removable suspension rod traversing an upper end of the drum;

vi.    including a food suspension member removably positioned on the rod for suspending food to be cooked a predetermined distance above the basket to regulate the rate of cooking of the food; and

vii.    Suspension supports located on an upper portion of the metal drum.

82.    MD is the alter ego of BHC because both utilize the same place of business, both have the same leadership such as Graves and Raymond Stewart, both utilize the same equipment, machines, labor, information technology systems such as computers, all from a common facility in Bakersfield, CA.   Further, the 16-gallon drums which are ordered from Myers and utilized by Defendants in the barrel house cooker are ordered and paid for by MD, not by BHC, constituting comingling of company assets.

83.    BHC was formed with the California Secretary of State by Graves and MD's CEO in order to attempt to shield MD from liability for its actions, patent infringement, breach of

contract, and misappropriation of PBC's confidential business information and trade secrets.

Graves is both the General Manager of MD and the President of BHC.

84.     Graves, MD and BHC each intentionally conspired to misappropriate PBC's

confidential business information, trade secrets, and infringe on PBC's Patent.

85.     Defendants also have intentionally published patently false information on their

website, http://www.barrelhousecooker.com/compare.php, about the Pit Barrel® in order to

falsely distinguish their product in order to make it appear better to the public than the Pit

Barrel® in material ways.  For example, Defendants falsely represent to the public, for their own

economic advantage, the following about the Pit Barrel®:

     i.    its metal thickness;
    ii.    that its porcelain coating is only on the outside the Pit Barrel®;
   iii.    that there is no multi-level grate system;
   iv.    that it is not hibachi capable;
    v.    that there is no modular nesting accessories;
   vi.    that there is no hang & grate capability;
   vii.    that there is no easy ash removal system;
 viii.    that there is no cooker stand;
   ix.    that its intake vent is "basic" whereas the barrel house is "advanced";
    x.    that there is no warranty, or that it is "N/A";
   xi.    that there is no 30-day satisfaction guarantee, or that it is "N/A."

86.     PBC and its members took reasonable steps to protect its confidential business

information and trade secrets by forming PBC with the Colorado Secretary of State, by seeking

and obtaining a patent, copywriting its website material (www.pitbarrelcooker.com/privacy), and

by registering Pit Barrel®.

87.     In spite of this, Defendants have conspired and taken intentional steps to embed

sufficient data in BHC's own website so as to ensure that search engines, such as Google,

Norton, and Ask, each result in a top 3 "hit" and link to www.barrelhousecooker.com when the

term(s) "pit barrel" or "pit barrel cooker" are entered into a search engine.   In fact, as of the date of this complaint, a search via Yahoo for "pit barrel" results in a top level search result and link to BHC's website.

## FIRST CLAIM FOR RELIEF
(Infringement of the '334 Patent – 35 U.S.C. § 1, *et seq.* v. All Defendants)

88.     Plaintiff incorporates by reference all averments in this Complaint.

89.     Defendants have manufactured, used, offered for sale, sold, and/or imported, and continues to manufacture, use, offer to sell, sell, and/or import a portable barrel cooker, including, but not limited to, the "Barrel Houses" cooker, that infringe the '334 Patent, in violation of 35 U.S.C. § 271(a).

90.     As a result of Defendants' infringement of Plaintiff's rights in the '344 Patent, Plaintiff has suffered and will continue to suffer damages in an amount to be proved at trial. In addition, Plaintiff is entitled to recovery of Defendants' profits pursuant to 35 U.S.C. § 289.

91.     Defendants' infringement of the '344 Patent has been with full knowledge of the '344 Patent and Plaintiff's rights therein. Defendants' continued infringement with full knowledge of the '344 Patent and Plaintiff's rights therein is willful.

92.     Defendants' willful infringement of Plaintiff's rights in the '344 Patent warrants an award of treble damages under 35 U.S.C. § 284, and makes this an exceptional case warranting an award of Plaintiff's reasonable attorney's fees and costs under 35 U.S.C. § 285.

93.     Defendants' infringement of the '344 Patent has caused irreparable harm to Plaintiff, and will continue to do so unless enjoined. As a result, Plaintiff is entitled to injunctive relief pursuant to 35 U.S.C. § 283.

## SECOND CLAIM FOR RELIEF
(C.R.S. § 7-74-101, et. seq., Colorado Uniform Trade Secrets Act v. All Defendants)

94.     Plaintiff incorporates by reference all averments in this Complaint.

95.     Plaintiff's current and prospective customer lists, marketing materials, pricing, sales strategies, designs, inspection and compliance practices, margins, etc., were the end result of a long process of culling the relevant information from lengthy and diverse sources, and/or not in the public domain, each constituting trade secrets.

96.     The design, construction, and operation of the Pit Barrel® was novel and unique in the portable barrel cooker market, along with its unique accessories and cooking method, constitute protectable trade secrets.

97.     Plaintiff's Pit Barrel® production process, design and operation of which, constitutes a unique combination, afforded Plaintiff a competitive advantage and is a protectable trade secret.

98.     Defendants each misappropriated Plaintiff's trade secrets when it violated the terms and conditions of its confidentiality agreement and when it brought into production and sale the barrel house cooker in order to compete with Plaintiff.

99.     Defendants each unlawfully disclosed or acquired Plaintiff's trade secrets.

100.    Defendants each unlawfully used and implemented Plaintiff's trade secrets for their commercial benefit.

101.    Defendants each had a duty to protect, or not to disclose, Plaintiff's trade secrets, which was then breached by Defendants when they each used the information for their own commercial benefit and in direct competition with Plaintiff.

102.     At all relevant times, Defendants each knew that Plaintiff's trade secrets were being misappropriated for an improper purpose.

103.     Defendants' misappropriation of Plaintiff's trade secrets was attended by circumstances of willful and wanton conduct and a disregard for Plaintiff's rights.

104.     Defendants have been unjustly enriched by their unlawful misappropriation of Plaintiff's trade secrets.

105.     As a direct proximate result and consequence of Defendants' willful and malicious misappropriation of Plaintiff's trade secrets, Plaintiff has and will continue to sustain actual damages, including consequential damages, costs, and attorney fees, in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
(Breach of Contract v. All Defendants)

106.     Plaintiff incorporates by reference all averments in this Complaint.

107.     Defendants, through the conduct of Graves and MD, entered into a written contract with Plaintiff to protect PBC's trade secrets.

108.     As a closely held corporate fiction incorporated to intentionally breach PBC's contract with MD, justice requires that Defendant BHC be liable for MD's and Graves's breach of the contract.  Justice further requires that Graves be personally liable for the debts of BHC because of the intentional acts which give rise to this action set forth elsewhere herein.

109.     Defendants breached their respective contracts with Plaintiff when they misappropriated PBC's trade secrets for their own personal and commercial benefit thereby also breaching the implied duty of good faith and fair dealing.

22

110.     Defendants also breached the contract when they permitted Graves to perform services as the President of BHC while also serving as the General Manager of MD, who MD knew or should have known was bound by the confidentiality provisions in the contract relating to PBC's confidential business information and trade secrets.

111.     As a direct proximate result and consequence of Defendants' material breaches of the contract, Plaintiff has and will continue to sustain substantial monetary damages, including consequential damages which were with the contemplation of the parties, in an amount to be proven at trial.

112.     Defendants have intentionally and under circumstances constituting bad faith violated the terms and conditions of their contracts with PBC in order to misappropriate PBC's confidential business information for their own commercial benefit.

113.     Plaintiff has performed its obligations under the contracts.

### FOURTH CLAIM FOR RELIEF
(Intentional Interference with Contract and Prospective Business Advantage v. All Defendants)

114.     Plaintiff incorporates by reference all averments in this Complaint.

115.     Plaintiff had separate and distinct contracts with Myers and MDW.

116.     Plaintiff's contracts included provisions for the protection of Plaintiff's trade secrets and for the supply of steel drums to Plaintiff for the use in the manufacture of the Pit Barrel®.

117.     At all relevant times, Defendants knew or reasonably should have known that Plaintiff had contracts with Myers ad MD, and as the third party beneficiary of such other contracts as with Nello described above.

118.    Defendants' words or conduct intentionally caused the other not to perform or terminate their respective contracts with Plaintiff.

119.    Defendants' interference with Plaintiff's contracts was improper, including its intentional interference with Plaintiff's prospective business relationships and economic advantage, including but not limited to prospective customers, vendors,, suppliers, and third-party retailers of the Pit Barrel® product.

120.    As a direct proximate result and consequence of Defendants' intentional interference with Plaintiff's contracts, Plaintiff has and will continue to sustain substantial monetary damages, including consequential damages, costs, and attorney fees, in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
(Unjust Enrichment v. All Defendants)

121.    Plaintiff incorporates by reference all averments in this Complaint.

122.    At Plaintiff's expense, it conferred a benefit on Defendants when it permitted them to have access to its confidential business information and trade secrets described elsewhere herein, which Plaintiff paid significant money to acquire over many years.

123.    Under the circumstances, it is unjust for Defendants to retain the benefit of the trade secrets and confidential business information without commensurate compensation to Plaintiff.

### SIXTH CLAIM FOR RELIEF
(Civil Conspiracy – All Defendants)

124.    Plaintiff incorporates by reference all averments in this Complaint.

125.    Defendants' actions intending to market and sell Plaintiff's products as their own, together with their plan and agreement to misappropriate Plaintiff's trade secrets for Defendants' own commercial benefit, constitutes a civil conspiracy.

126.    When Defendants agreed by words and conduct to go into business with one another following the termination of the PBC project in order to design, market and sell the barrel house cooker, they each entered into a civil conspiracy to misappropriate Plaintiff's trade secrets and confidential business information through the intentional violation of their respective obligations under various written contracts with Plaintiff, 35 U.S.C. § 1, *et seq.,* and the Colorado Uniform Trade Secrets and Consumer Protection Acts.

127.    Defendants are each therefore jointly and severally liable to Plaintiff.

128.    As a direct proximate result and consequence of Defendants' civil conspiracy, Plaintiff has and will continue to sustain actual damages, lost profits, lost market share, consequential damages, costs, and attorney fees, in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
(Deceptive or Unfair Trade Practices v. All Defendants)

129.    Plaintiff incorporates by reference all averments in this Complaint.

130.    Defendants actions as set forth herein constitute deceptive trade practices within the meaning of the Colorado Consumer Protection Act, and specifically, C.R.S. § 6-1-105 by knowingly passing off Plaintiff's goods, services, or property as their own and by failing to disclose material information concerning the products, and by making false or misleading statements of fact with respect to the price and quality of goods utilized by Plaintiff in the production of their products.

131.    Defendants' false representations and/or concealments constitute violations of the Colorado Consumer Protect Act ("CCPA"), C.R.S. § 6-1-101 *et. seq.*

132.    Defendants' action took place within the course of Defendants' business,

vocation, or occupation.

133.    Defendants' actions significantly impacted the public insofar as actual and potential customers utilize the products which are the subject of this action.  Misrepresentations and concealment concerning the manufacturer and quality of these products bought and sold across state lines and throughout the State of Colorado rises to the level of a significant public impact.

134.    Upon information and belief, Defendants' deceptive trade practices where directed to consumers within the State of Colorado, and across the country.

135.    Plaintiff has suffered injuries in fact to its legally protected interests.

136.    Defendants' actions in violation of C.R.S. § 6-1-101, *et seq*., caused Plaintiff injuries, damages and losses, entitling Plaintiff to their actual damages and other recoveries allowed under the law.

137.    Plaintiff is entitled to, and hereby demands as damages, three times the amount of their actual damage, plus costs and attorney fees pursuant to C.R.S. § 6-1-113.

### EIGHTH CLAIM FOR RELIEF
(Civil Theft, C.R.S. § 18-4-405 v. All Defendants)

138.    Plaintiff incorporates by reference all averments in this Complaint.

139.    Defendants committed theft of Plaintiff's trade secrets.  BHC knowingly obtained Plaintiff's property and trade secrets under false pretenses and with the assistance of Graves and MD.

140.    MD and Graves each unlawfully disclosed Plaintiff's property and trade secrets to unauthorized person(s) such as BHC and its employees, members, managers, officer, directors, contractors, or agents, and without authority, made or caused  to be made a copy of an article representing Plaintiff's trade secret obtained in June, 2014  - July, 2014.

141.    Plaintiff discovered Defendants' unlawful conduct when Defendants launched the barrel house cooker in November, 2015.

142.    Defendants have each unlawfully exercised control over Plaintiff's property, including its trade secrets relating to the Pit Barrel®.

143.    Defendants acted with the intent to either permanently deprive or withhold from Plaintiff, as the owner of the trade secrets, the control of its trade secrets and appropriated Plaintiff's trade secret to his or her own use or to the use of another.

WHEREFORE, Plaintiff incorporates by reference each and every allegation in this complaint, and prays for judgment against Defendants in an amount to be proven at trial as follows:

A.     A preliminary and/or permanent injunction restraining Defendants, its officers, agents, servants, employees, directors, representatives, successors-in-interest, parent corporations, subsidiary corporations, affiliated companies, and all other persons, firms or entities acting in concert or participating with them, directly or indirectly, who receive actual notice of this judgment, from manufacturing, using, marketing, distributing, selling, offering to sell, and importing any portable barrel cooker that infringes the '334 Patent;

B.     An award to Plaintiff of its actual damages based on its claims in an amount according to proof;

C.     An award to Plaintiff of a reasonable royalty or the total lost profits received or derived by Defendants from the manufacture, marketing, sale, offering for sale, and/or distribution of products bearing or using any copy or colorable imitation of the '334 Patent pursuant to 35 U.S.C. § 289;

D.     A declaration that Defendants' infringement and other wrongful acts herein alleged be determined deliberate, willful, and in conscious disregard of Plaintiff's rights pursuant to 35 U.S.C. § 284;

E.     A declaration that this case is exceptional, and, in conjunction therewith, an award of reasonable attorney's fees and costs pursuant to 35 U.S.C. § 285;

F.      An award of treble damages against Defendants pursuant to 35 U.S.C. § 284 as a result of Defendants' deliberate and willful infringement in conscious disregard of Plaintiff's rights;

G.     For actual damages and consequential damages including, lost profits, lost sales, research and development damages, royalties, Defendants' profits from the misappropriation,

and special damages, equitable damages, and all other damages allowed by law or equity together with costs of suit, fees of experts, prejudgment interest, and post judgment interest as allowed by law;

H.    For three times the amount of actual damages pursuant to C.R.S. §§ 6-1-113 and 18-4-405;

I.    For attorney fees and costs pursuant to law and C.R.S. §§ 7-74-105, 6-1-113 and 18-4-405;

J.    Such other and further equitable and legal relief as this Court deems just and proper.

### PLAINTIFF DEMANDS TRIAL BY JURY OF ALL CLAIMS SO TRIABLE.

Dated: December 24, 2015.

Respectfully Submitted,

ELKUS SISSON & ROSENSTEIN, P.C.

By:    /s/ Scott D. McLeod_____
501 South Cherry St., Ste. 920
Denver, CO 80246
303-567-7981
smcleod@elkusandsisson.com
*Attorneys for Plaintiff*

Plaintiff's Address:
13011 W Hwy 42, Ste., 206
Prospect, KY 40059